470 So.2d 770 (1985)
Joyce Bernice HAWTHORNE, Appellant,
v.
STATE of Florida, Appellee.
No. AN-435.
District Court of Appeal of Florida, First District.
June 7, 1985.
*771 Leo A. Thomas, of Levin, Warfield, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A., Pensacola, for appellant.
Jim Smith, Atty. Gen., and Andrew Thomas, Asst. Atty. Gen., Tallahassee, for appellee.
Kit Kinports, Donald N. Bersoff and Bruce J. Ennis, of Ennis, Friedman, Bersoff & Ewing, Washington, D.C.; and Robert Augustus Harper, Jr., Tallahassee, for amicus curiae American Psychological Ass'n.
WIGGINTON, Judge.
This is an appeal from a conviction of manslaughter arising from Joyce Hawthorne's third trial for the murder of her husband. Her first conviction, for first degree murder, was reversed by this Court in Hawthorne v. State, 377 So.2d 780 (Fla. 1st DCA 1979) (Hawthorne I). The opinion in that case contains an adequate presentation of the facts surrounding the shooting of appellant's husband, Aubrey Hawthorne, and those facts will not be reiterated here.
Appellant's second conviction, for second degree murder, was also reversed by this Court in Hawthorne v. State, 408 So.2d 801 (Fla. 1st DCA 1982) (Hawthorne II). For reasons similar to those set forth in Hawthorne I and II, we are again compelled to reverse and remand for a new trial.
In Hawthorne I, the thrust of this Court's opinion was directed toward the admissibility of appellant's statements and confessions made to the police within twenty-four hours of her arrest. We held that the recorded statement was invalid as being coerced and involuntary, and voiced our continuing concern that "the fundamental rights of an individual charged with violation of the law be observed and protected by law enforcement officials and by the courts." 377 So.2d at 785. Accordingly, we admonished the state that "[o]n retrial of defendant, her statements and confessions, or any evidence relating thereto, are inadmissible." Id.
In Hawthorne II this Court reversed the conviction of second degree murder for several reasons, one being that the trial court erred in allowing the state to impeach Mrs. Hawthorne's testimony using her testimony from the first trial, because the state failed to show that the prior testimony used for impeachment purposes "was not the product of the illegally obtained and unreliable statement." 408 So.2d at 804. In addition, we found these references at the second trial to the contents of the illegally obtained statement "ignored this *772 court's admonition in the first Hawthorne opinion... ." Id.
In the instant case, we are presented with a slightly different twist of the same issue. During the third trial the prosecution attempted to impeach Mrs. Hawthorne's testimony, that the next thing she remembered after firing the shotgun was calling the Sheriff's Department for an ambulance, by asking her whether she didn't call her lawyer first. Notwithstanding strenuous objections made by defense counsel, the trial court permitted the prosecution to continue questioning Mrs. Hawthorne along this line.[1] In so doing the court committed reversible error.
After carefully reviewing the record, we are convinced that the impeachment effort had as its source the illegally obtained statement.[2] The state would argue that this situation differs from the circumstances on which our two prior Hawthorne decisions are based in that it did not make reference to the previously suppressed statements or the prior trial testimony before the jury. However, the state is attempting to do indirectly what it was prohibited from doing directly by this Court's *773 admonition in Hawthorne I. The state's utilizing the illegally obtained statement without direct reference to it is no less damaging to Mrs. Hawthorne's fundamental rights than is its introducing the statement itself. Hence, in Hawthorne I we prohibited not only the use of her "statements and confessions," but "any evidence relating thereto." [Emphasis added]. Such admonition contemplates any use of the involuntary statements either directly or indirectly, and the state's action here constituted nothing less than subtle treachery.
We note in passing that subsumed under this point was appellant's argument that the state violated Mrs. Hawthorne's rights under the Sixth and Fourteenth Amendments of the United States Constitution, and under article I, section 16, of the Florida Constitution by making reference in its closing argument to Mrs. Hawthorne's contacting an attorney on the night of the murder and inferring therefrom a guilty motive. For the edification of the parties, as our above holding relieves us of further discussion under this point, we find that the defense opened the door for the prosecution's closing remarks. This is not to say, however, that we condone the prosecution's implying to the jury that Mrs. Hawthorne could not have acted in self-defense if she had called a lawyer before calling an ambulance; and we instruct the prosecution, and the defense, to avoid such prejudicial statements on retrial. See generally United States ex rel. Macon v. Yeager, 476 F.2d 613 (3d Cir.1973), cert. denied, 414 U.S. 855, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973); and United States v. McDonald, 620 F.2d 559 (5th Cir.1980).
The next argument by appellant is that the trial court erred in failing to admit the expert testimony of Dr. Lorraine Walker that appellant was a battered woman. In Hawthorne II we considered the admissibility of expert testimony regarding the battered woman syndrome and concluded that the subject matter of the expert opinion would provide the jury with an interpretation of the facts not ordinarily available to them or within their understanding. However, we stated that our determination in that regard "is subject to the trial court determining that Dr. Walker is qualified and that the subject is sufficiently developed and can support an expert opinion." 408 So.2d at 806. [Emphasis added]. Our placing this ultimate determination with the trial court recognizes a trial court's broad discretion in determining the range of subjects on which an expert may be allowed to testify, and, unless there is a clear showing of error, its decision will not be disturbed on appeal. Rivers v. State, 425 So.2d 101 (Fla. 1st DCA 1982); Johnson v. State, 393 So.2d 1069 (Fla. 1980); Buchman v. Seaboard Coast Line Railroad Company, 381 So.2d 229 (Fla. 1980); Fotianos v. State, 329 So.2d 397 (Fla. 1st DCA 1976); Johnson v. State, 314 So.2d 248 (Fla. 1st DCA 1975).
In the instant case, pursuant to our mandate in Hawthorne II, the trial court presided over three days of hearings to determine the adequacy of Dr. Walker's qualifications as an expert witness in the field of study known as the "battered woman syndrome," and to determine the extent to which her methodology is generally accepted. The latter determination would indicate the subject matter could support a reasonable expert opinion. Although it does not conclusively appear from the order whether the trial court made a determination as to the adequacy of Dr. Walker's qualifications, the ambiguity in that regard appears to be largely a result of the trial court's devoting its order to the ultimate conclusion that, based on Dr. Walker's research, "the court is not convinced that she has knowledge necessary to give such testimony... ." The court so concluded due to its finding that the "depth of study in this field has not yet reached the point where an expert witness can give testimony with any degree of assurance that the state of the art will support an expert opinion," and that "Dr. Walker's research will not permit her to draw any conclusions from the facts of this case." A careful reading of the transcript persuades us that the trial court *774 did not abuse its discretion. Although the witnesses tendered by both the defense and the state generally agreed that Dr. Walker is eminently qualified as a "battered woman syndrome" expert, and that the syndrome is a subject sufficiently developed and able to support an expert opinion, their ostensibly earnest attestation in that regard was belied by their equally earnest criticism levied against Dr. Walker's study.
Our determination that the trial court did not abuse its discretion in failing to permit Dr. Walker to testify as an expert witness does not, of course, preclude the defense on retrial to reoffer this witness or any other witness as an expert on this subject. Again, the trial court has the discretion to determine the qualifications of the expert and whether the subject can support an expert's opinion.
We have fully considered the remaining points and arguments raised in appellant's brief and affirm. However, in view of our reversal on the first point, one of the remaining points will be discussed, briefly, for guidance during retrial. Appellant argues that the trial court erred in refusing to instruct the jury on circumstantial evidence. Although appellant recognizes that the Florida Supreme Court approved the elimination of this jury instruction,[3] she argues that when a case rests solely upon circumstantial evidence, as does this case, it is an abuse of discretion for the trial court to refuse to give the instruction on circumstantial evidence. Apart from our disagreement with appellant's premise that her case is wholly circumstantial, we disagree that the trial court abused its discretion. It instructed the jury on reasonable doubt and burden of proof. Those instructions were sufficient.
For the reasons hereinabove set forth, this cause is AFFIRMED in part, REVERSED in part, and the case REMANDED for a new trial.
THOMPSON, J., concurs.
ERVIN, C.J., concurs in part and dissents in part with written opinion.
ERVIN, Chief Judge, concurring in part and dissenting in part.
I fully agree with the majority as to its reversal of the first point raised. I disagree, however, with its affirmance of the trial court's order disallowing the admissibility of the proffered testimony of Dr. Lenore Walker relating to the subject of the battered woman syndrome.[1] In so saying, I fully understand the reticence of the majority to reverse a finding made by the trial court on the ground that such finding constitutes an abuse of discretion. The rule in Florida historically has been that the decision as to whether a purported expert witness possesses the necessary expertise to testify is one within the discretion of the trial judge and will not be disturbed unless clearly erroneous and prejudicial to the adverse party. Buchman v. Seaboard Coast Line Railroad Co., 381 So.2d 229 (Fla. 1980); Quinn v. Millard, 358 So.2d 1378 (Fla. 3d DCA 1978); Seaboard Air Line Railroad Co. v. Lake Region Packing Association, 211 So.2d 25 (Fla. 4th DCA 1968), cert. denied, 221 So.2d 748 (Fla. 1968). Nevertheless, the trial judge's order in my judgment is flawed in both its legal and factual conclusions, and our prior opinion in Hawthorne v. State, 408 So.2d 801 (Fla. 1st DCA), rev. denied mem., 415 So.2d 1361 (Fla. 1982) (Hawthorne II), adopting certain language from Ibn-Tamas v. United States, 407 A.2d 626 *775 (D.C. 1979) (Ibn-Tamas I), may have added to the confusion.
Hawthorne II, following Ibn-Tamas I, which in turn followed Dyas v. United States, 376 A.2d 827 (D.C.), cert. denied, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977), applied a three-fold test for determining the admissibility of expert testimony relating to the subject of the battered woman syndrome: (1) Whether the expert is qualified to give an opinion on the subject matter;[2] (2) whether the state of the art of scientific knowledge permits a reasonable opinion to be given by the expert;[3] and (3) whether the subject matter of the expert opinion is so related to some science, profession, business or occupation as to be beyond the understanding of the average layman.[4]Hawthorne II held that the third criterion had been established; that Dr. Walker's testimony would aid the jury in understanding "`why a person suffering from battered-woman's syndrome would not leave her mate, would not inform police or friends, and would fear increased aggression against herself....'" 408 So.2d at 806 (quoting Smith v. State, 247 Ga. 612, 277 S.E.2d 678, 683 (1981)). Because all three of the Dyas criteria must be established in order to satisfy the threshold question of the syndrome's admissibility, this court remanded the case to the trial court for a determination of the first two requisites.
Although the trial court's order on remand was silent as to whether appellant had presented adequate proof as to criterion number one  the issue going to Dr. Walker's qualifications  I agree with the majority that the record reflects that "Dr. Walker is eminently qualified as a `battered woman syndrome' expert", ante at 774, and I would conclude on the basis of the record before us that if the trial court had ruled to the contrary, such determination would not have been supported by the evidence.[5]
In addition to deciding Dr. Walker's qualifications, the trial court was directed by Hawthorne II to consider "the extent to which her methodology is generally accepted[,] indicating that the subject matter can support a reasonable expert opinion." 408 So.2d at 806. The lower court was thus directed, as a means of establishing the validity of the underlying principle or theory, to determine whether the methods used by Dr. Walker had gained general acceptance in the particular field  a field identified in Ibn-Tamas I as "broad enough to include clinical psychology." 407 A.2d at 637. The lower court was not asked to decide additionally  in order to answer the question whether the subject matter could support a reasonable expert opinion  whether Dr. Walker's findings had received acceptance in that field. As stated in Ibn-Tamas I: "[S]atisfaction of the third Dyas criterion [the general acceptance standard] begins  and ends  with a determination of whether there is general acceptance of a particular scientific methodology, not an acceptance, beyond that, of particular study results based on that methodology." 407 A.2d at 638. The court's order below, however, is unclear as to whether it complied with our specific directions, or extended its inquiry to determine as well general acceptance in the appropriate field of Dr. Walker's test results:
The court finds that the subject of spouse abuse and the battered wife syndrome is relatively new and has become *776 increasingly the subject of study by social scientists. From reading the exhibits offered into evidence this court is convinced that the depth of study in this field has not yet reached the point where an expert witness can give testimony with any degree of assurance that the state of the art will support an expert opinion. Dr. Walker's research will not permit her to draw any conclusions from the facts of this case.
The above portion of the order, particularly its reference to the "subject of spouse abuse" and Dr. Walker's "research", adds to the confusion, suggesting that the lower court's denial may have been based more on the belief that her findings  rather than her methods  were not generally accepted. If the court extended its determination beyond our directions, then clearly the order for that reason alone should be considered an abuse of discretion. Perhaps another remand of the case to the trial court would be appropriate, requiring the court to clarify its order, but I do not think such additional step is necessary, given the status of the record before us. If, alternatively, the order can simply be considered a rejection of Dr. Walker's methodology, because the court considered it was not generally accepted by the particular field (clinical psychology) in which such testimony belongs, then in my judgment there exists no competent record support for that conclusion, and it should for that reason be reversed as an abuse of discretion.
The remainder of this opinion is divided into two parts, the first relating to why, based upon the standard of review by which we framed the questions directed to the lower court in Hawthorne II, the lower court's order disallowing Dr. Walker's proffered testimony represents an abuse of discretion, requiring reversal; and the second part discussing why the standard selected by us in Hawthorne II is not preferred under Florida's Evidence Code, therefore requiring in future cases a different test to be applied when determining the admissibility of novel scientific theories or techniques.

I. THE LOWER COURT'S ORDER, DISALLOWING DR. WALKER'S PROFFERED TESTIMONY, WAS INCONSISTENT WITH THE FRYE RULE, REQUIRING IT TO BE REVERSED AS AN ABUSE OF DISCRETION.

A. The record before us does not support the result reached by the trial court.
At the hearings held before the trial court following remand, six witnesses were called. The first, Dr. McClure, a clinical and forensic psychologist, and an expert in clinical and child psychology, testified that he had reviewed Dr. Walker's research and articles, and in his opinion all three of the criteria required by this court in Hawthorne II were met. As to Dr. Walker's qualifications, he stated that her position as a "diplomate" in clinical psychology places her well above an average practitioner; and, although he considered that her research methods were still in the preliminary stage, he nonetheless concluded the methodology used by her was generally accepted. Dr. Ronald C. Yarbrough, also a clinical psychologist, agreed with Dr. McClure that Dr. Walker was qualified to give an opinion regarding the applicability of the battered woman syndrome, and, while he, like Dr. McClure, considered that research in the field is relatively new, also agreed that her methodology was generally accepted. As to her methods, he observed that she had gained information from 110 battered women interviewed in the Denver area, which ultimately became the subject of her book, The Battered Woman (Harper and Row, 1979), and that the research reflected in the book led to a much more thorough and intensive study, published in 1981, as a result of a grant received by her from the National Institute of Mental Health (NIMH). Dr. Lenore Walker testified that she had appeared as a witness in over 35 cases involving battered wives and that her testimony has been excluded in only four cases. She added that there are now over 100 professionals studying and doing research in the area of family violence. *777 She continued that she had personally interviewed the defendant, conducted the same clinical evaluation procedures on her as she had on all four hundred battered women whom she had interviewed during her NIMH studies, and concluded that defendant fit the pattern of a battered woman. Although admitting that the persons whom she had interviewed answered advertisements, she nonetheless felt that they were more representative of the subject matter than would be women selected only from shelters, or police files. Dr. Richard Gelles, professor of sociology at the University of Rhode Island, was recognized by the witnesses at the hearing as the foremost expert on family violence and spouse abuse. He has worked with Dr. Walker and considers her to be among the ten best known professionals in the field, and moreover has referred a number of requests for expert testimony to her. He continued that the field of expertise of family violence was now generally recognized by the American Sociological, Psychological, Psychiatric and Criminology Associations. In his opinion, the majority of Dr. Walker's findings were consistent with those of other researchers. He, as had the previous witnesses, also considered her methodology generally accepted, and concluded her background and interviews with over 400 battered women make her better qualified than anyone else to give an opinion as to whether the defendant in the present case was a battered woman.
Dr. Marc Gertz, an associate professor of criminology at Florida State University, was called by the state and qualified as an expert in social science research and methodology. While admitting that he had never done clinical research, never administered psychological tests, and was not well versed in psychology, he nevertheless criticized Dr. Walker's methodology as biased, over-generalized and unreliable. Finally, Dr. William Glen Doerner, an associate professor of criminology at Florida State University, as well as a reserve police officer for the Tallahassee Police Department, was proffered by the state. He, like Dr. Gertz, admitted he had no background in clinical psychology, and conceded that the study of battered women is a recognized field of study that can support an expert opinion, in that such methodology is used in all areas of social science research. He did, however, criticize Dr. Walker's methods for lacking a control group, a group of non-battered women, so that their characteristics could be compared with those battered.
A primary criticism leveled at Dr. Walker's methodology by both Gertz and Doerner was that the women who were the subject of the study were not randomly selected but voluntarily answered advertisements, thus leading, in their opinion, to biased results and unrepresentative samples. Dr. Walker's studies, Doerner stated, were based on "caught" cases, whose subjects are small, non-representative samples of women; therefore the resulting generalizations by Dr. Walker to a larger population are, in his opinion, highly suspect.
The lower court, in excluding Dr. Walker's testimony, relied, in addition to the testimony of Doctors Doerner and Gertz, upon an article written by Dr. Gelles, which appeared in the February 1982 issue of Journal of Marriage and the Family, entitled, "Applying Research on Violence to Clinical Practice". The article listed six major limitations to current research and theory in the field of family violence.[6] Among other things, it criticized most of the current studies on family violence as making generalizations from small, non-representative segments of the population, without any comparison being made with control groups at large. Dr. Gelles' testimony at the hearing, however, shows that his views had altered since he wrote the article referred to in the trial judge's order. He testified that after reading Dr. Walker's book, The Battered Woman, he considered it interesting and informative, although not terribly creative or vigorous, *778 but, after reviewing her later report funded by NIMH, in which Dr. Walker had expanded her survey from 110 women to more than 400, he commented that he was surprised to see how conservative she had become in presenting her findings.
Concerning the criticisms leveled at Dr. Walker's methodology by the two state witnesses regarding Dr. Walker's overbroad generalizations from non-representative samples in the Denver area, Dr. Gelles testified that her findings compared favorably with his own national study on violence toward women, and that the differences from region to region were not so great that one could not say that what was happening in Los Angeles, or other metropolitan areas, was not fairly similar to what was happening in, for example, less urban north Florida.
The testimony above recited was clearly in conflict. Appellant has argued that the differences in the experts' opinions regarding the acceptability of Dr. Walker's methods, used in arriving at her conclusions, goes to the weight of Dr. Walker's testimony, a jury question, rather than the admissibility of such testimony. In support of this argument, appellant cites a number of Florida decisions holding that the weight to be given to an expert's opinion is one to be determined by the jury. See, e.g., Holland v. State, 359 So.2d 28, 29 (Fla. 3d DCA 1978); cert. denied, 367 So.2d 1124 (1979); Coppolino v. State, 223 So.2d 68, 75 (Fla. 2d DCA 1968) (Mann, J., concurring specially), appeal dismissed, 234 So.2d 120 (Fla. 1969). Similarly, appellant relies upon cases stating that disagreements about the specific procedures used by the witness or the accuracy of the expert's conclusions or results affect the weight to be accorded such testimony. See Vaillancourt v. State, 288 So.2d 216, 218 (Fla. 1974) (per curiam); Land v. State, 156 So.2d 8, 11 (Fla. 1963); Eierle v. State, 358 So.2d 1160, 1161 (Fla. 3d DCA 1978).
The difficulty with appellant's argument is that the trial judge was required to follow the directions given him by Hawthorne II. He was instructed to determine the extent to which Dr. Walker's methodology is generally accepted, as a means of deciding whether the subject of her research could reasonably support an expert opinion. This criterion is clearly patterned after the "general acceptance", or Frye rule, originally set forth in Frye v. United States, 293 F. 1013, 1014 (D.C. Cir.1923), as follows:
Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while the courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

(e.s.) This court's uncritical adoption of the Frye standard no doubt contributed to the result reached below, a result which could have been avoided if we had patterned our directions after the procedure represented in Florida's Evidence Code.
At any event, whether our directions in Hawthorne II were inconsistent with the code is immaterial. The decision in Hawthorne II became the law of the case, and, under that doctrine, we, like the trial judge, have no recourse other than to follow what was once established between the same parties in the case, whether the earlier decision was correct on general principles or not, so long as the facts on which the decision was predicated continue to be the facts in the present case. See Alford v. Summerlin, 423 So.2d 482, 485 (Fla. 1st DCA 1982). Accepting this principle, I nevertheless remain of the view, based on the record before us, that the order of suppression was inconsistent with Frye, and should, as stated, be reversed as an abuse of discretion.
The court's decision to disallow Dr. Walker's testimony was the same as that reached by the trial court after remand in Ibn-Tamas v. United States, 455 A.2d 893 *779 (D.C. 1983) (Ibn-Tamas II). Ibn-Tamas II upheld, as a proper exercise of the trial court's discretion, the conclusion "`that defendant failed to establish a general acceptance by the expert's colleagues of the methodology used in the expert's study of battered women.'" 455 A.2d at 894. Stating that its scope of review is "`narrow' to the point where manifest error must appear for reversal", the appellate court found none, and therefore affirmed. Because we do not know the quality and type of all the evidence reviewed by the court in Ibn-Tamas II, it does not necessarily follow that its decision to affirm should be accepted by us.
The record in the instant case, regardless of the conflict in testimony, convinces me that the lower court's refusal to admit the testimony proffered by appellant was error. In my judgment, the testimony of the two state witnesses should not have been admitted for the purpose of impeaching the admissibility of Dr. Walker's testimony, due to the simple reason that the witnesses were not sufficiently qualified to offer an opinion on the question submitted. Neither of the two, Gertz or Doerner, were qualified within the relevant field  identified in Ibn-Tamas I as clinical psychology. They admittedly were not familiar with testing techniques commonly used in that field. As stated in United States v. Williams, 583 F.2d 1194, 1198 (2nd Cir.1978), "Selection of the `relevant scientific community,' appears to influence the result." Thus, in People v. King, 266 Cal. App.2d 437, 450, 72 Cal. Rptr. 478, 486-87 (1968), the court rejected expert testimony relating to voiceprint identification because the expert had no educational background substantiating his analysis of the functions of the body which produce speech. It should be observed that at least one court applying Frye indicates that those experts having the greater experience in the particular field will be preferred:
[The] Frye standard does not require unanimity of view, only general acceptance; a degree of scientific divergence of view is inevitable. In this case we are disposed to give greater weight to those experts who have had direct empirical experience in the field of spectography [voiceprints].
Commonwealth v. Lykus, 367 Mass. 191, 204 n. 6, 327 N.E.2d 671, 678 n. 6 (1975).
In Florida, admittedly, a witness may qualify as an expert by reason of his study of authoritative sources without any particular experience involving the subject matter. Seaboard Air Line Railroad Co. v. Lake Region Packing Association, 211 So.2d 25 (Fla. 4th DCA 1968). It is also the rule in Florida, however, that a witness may only be allowed to testify as an expert in the area of his own expertise, and if he goes beyond his expertise, the allowance of such testimony has been held to be an abuse of discretion. See Sea Fresh Frozen Products, Inc. v. Abdin, 411 So.2d 218, 219 (Fla. 5th DCA 1982); Prohaska v. Bison Co., 365 So.2d 794 (Fla. 1st DCA 1978); Salinetro v. Nystrom, 341 So.2d 1059, 1061 (Fla. 3d DCA 1977).
In my judgment the state's two witnesses, Doerner and Gertz, failed to demonstrate that they were sufficiently qualified to meet section 90.702's test for testimony by experts: "[A] witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion...." Neither of the two, as stated previously, demonstrated sufficient knowledge, skill, experience, training, or education in the field in which the subject matter of Dr. Walker's research belongs. I would therefore view the admission of their impeaching testimony as an abuse of discretion, requiring reversal of the lower court's order.

B. In that judicial notice can be taken of the general acceptance standard, we are not bound solely by the record in the case on review, but may notice other cases which consider the subject matter generally accepted by the appropriate field as a means of determining whether the trial court's order of denial was a proper exercise of discretion.
There is an additional reason  not apparent from this record  why the trial court's *780 order should be reversed. The brief of amicus curiae, the American Psychological Association, supporting appellant, argues that there are three general methods of proof that have been recognized by the courts to establish general acceptance by the identified scientific community: (1) expert testimony, (2) scientific and legal literature, and (3) judicial opinions. Amicus argues that in addition to our consideration of expert testimony going to the issue in the record before us, we can take judicial notice of both scientific literature and the number of cases recognizing general acceptance by the relevant scientific community of the battered woman syndrome.
I consider that we are not limited in our review of the issue by the proffered testimony below, but that we may extend our inquiry to notice judicially opinions from other jurisdictions holding that the battered woman syndrome is so generally recognized by the relevant field that it can support a reasonable opinion. As Professor Giannelli points out, some courts treat the general acceptance issue as a matter of law, subject to de novo review on appeal, while others consider that the determination of general acceptance is primarily a question of fact for the trial court, subject to an appellate court's determination that the trial court has not abused its discretion. Giannelli, The Admissibility of Novel Scientific Evidence: Frye v. United States, A Half-Century Later, 80 Colum.L.Rev. 1197, 1222 (1980) [hereinafter: Giannelli]. The primary reason offered for following the latter approach is, as stated in Mills v. Redwing Carriers, Inc., 127 So.2d 453, 458 (Fla. 2d DCA 1961): "[T]he trial court, in hearing the testimony and observing the witnesses, has superior advantages in ruling on the admissibility of expert testimony ... [.] [T]he ... ruling is therefore entitled to great weight and will not be pronounced erroneous unless clearly so made to appear... ." These concerns were similarly echoed by the Ibn-Tamas I court: "If we were to rule without the benefit of either trial court discretion, on the one hand, or an opportunity to observe and appraise the witness, on the other, at least one party ... would be adversely affected in the sense of losing the right to a discretionary ruling." 407 A.2d at 636 n. 17.
I do not consider the discretionary standard of review, limited to the record on appeal before an appellate court, to be the appropriate means of deciding the general acceptance issue. While it has long been recognized that a trial judge has discretion with respect to determining an expert's qualifications, the "question of qualifying the expert" should not control the "question of qualifying the process." Comment, Evidence: Admissibility of Spectrographic Voice Identification, 56 Minn.L.Rev. 1235, 1246 (1972) (e.s.). In the case at bar, the lower court was asked to decide whether Dr. Walker's methodology was generally accepted within the field. If a trial judge, as here, is required to apply the general acceptance standard to determine the reliability of a novel scientific technique within a given field, that standard should not change from case to case. As the Maryland Supreme Court has observed: "The answer to the question about the reliability of the scientific technique or process does not vary according to the circumstances of each case. It is therefore inappropriate to view this threshold question of reliability as a matter within each trial judge's individual discretion." Reed v. State, 263 Md. 374, 381, 391 A.2d 364, 367 (1978) (e.s.).
Regarding amicus's argument that we may extend our review by taking judicial notice of scientific and legal literature recognizing general acceptance by the relevant scientific community of the battered woman syndrome, I am aware that Florida's Evidence Code does not permit judicial notice of scientific literature as a means of substantive proof of an expert opinion, see section 90.706[7] (restricting the use of such literature to the cross-examination of an expert witness); nevertheless, *781 Florida does permit judicial notice of opinions from other jurisdictions. See section 90.202(2), authorizing judicial notice of the "[d]ecisional ... law of every other state, territory, and jurisdiction of the United States." There is obviously then no bar to our judicial notice of opinions that recite within them scientific literature or expert testimony acknowledging the battered woman syndrome. Thus, in State v. Kelly, 97 N.J. 178, 478 A.2d 364 (1984), the court observed that the record before it revealed that the battered woman syndrome had been acknowledged and accepted by practitioners and researchers in the fields of psychology and psychiatry, discussed at several symposia since 1977, sponsored by such organizations as the Association for the Advancement of Behavior Therapy and the American Sociological Association, and the subject of at least five books and almost seventy scientific articles and papers. The Kelly court referred to Dr. Walker's book, The Battered Woman, in describing the battering cycles that occur to such women. Id. 478 A.2d at 371-72. See also legal literature recognizing the existence of the syndrome, recited in People v. Minnis, 118 Ill. App.3d 345, 74 Ill.Dec. 179, 455 N.E.2d 209, 217 (1983).
Finally, there would appear to be no bar to our recognizing the number of cases in which similar expert testimony was admitted or rejected. See Kaminski v. State, 63 So.2d 339, 340 (Fla. 1953) (on rehearing) (reciting the number of jurisdictions declining to admit results obtained from lie detector tests); see also Bundy v. State, 471 So.2d 9 (Fla. 1985) (Bundy II), which, in reversing a trial judge's denial of a motion to suppress hypnotically refreshed testimony, relied exclusively upon cases from other jurisdictions holding such evidence inadmissible.
My research of opinions from out-of-state jurisdictions, relating to the question of the admissibility of the battered woman syndrome evidence, reveals that a substantial majority either conditionally or unconditionally hold that the syndrome can reasonably support an expert opinion. See, e.g., Smith v. State, 247 Ga. 612, 277 S.E.2d 678 (1981) (pursuant to the Federal Rules of Evidence and Georgia common law, an expert can give an opinion of the syndrome, even though such evidence goes to the ultimate facts); State v. Baker, 120 N.H. 773, 424 A.2d 171 (1980) (evidence of battered wife syndrome admissible as legally relevant); State v. Anaya, 438 A.2d 892 (Me. 1981) (evidence relating to battered wife syndrome admissible where psychologist was shown to be qualified to testify and the defendant established she was a battered woman); State v. Dozier, 163 W. Va. 192, 255 S.E.2d 552 (1979) (since defendant's primary defense was self-defense, she should be entitled to elicit testimony about her prior physical beatings in order for the jury to evaluate and fully consider her mental state at the time of the commission of the offense); State v. Allery, 101 Wash.2d 591, 596, 682 P.2d 312, 315 (1984) (en banc) (battered woman syndrome sufficiently established in scientific community for the purpose of aiding the jury in understanding the reasonableness of defendant's apprehension of imminent death or bodily injury); People v. Minnis (trial court's order disallowing evidence of syndrome on the ground that it applied only to non-confrontational situations at the time of the offense, and not to events which transpired afterwards, reversed on the ground that defendant had the right to introduce evidence to rebut the state's evidence of consciousness of guilt). See also cases collected in annot., 18 A.L.R. 4th 1153 (1982).
On the other hand, other courts have held such evidence inadmissible based on the particular circumstances before them. See, e.g., Ibn-Tamas II; Buhrle v. State, 627 P.2d 1374 (Wyo. 1981); Fielder v. State, 683 S.W.2d 565 (Tex. App.2d Dist. 1985); State v. Leidholm, 334 N.W.2d 811, 819 (N.D. 1983); Buhrle and Fielder upheld the exclusion of evidence relating to the battered woman syndrome on the ground that its admission would invade the province of the jury. In both cases, the proffered testimony was rejected, among other grounds, because the experts would testify that the *782 defendants perceived themselves to be acting in self-defense. In order to avoid this type of problem, several commentators suggest that the expert should limit his or her opinion only to the issue of whether the defendant fits a particular profile. See E. Cleary, McCormick on Evidence § 206 at 636, n. 4 (3d ed. 1984) [hereafter: McCormick]; Note, The Expert as Educator: A Proposed Approach to the Use of Battered Woman Syndrome Expert Testimony, 35 Vand.L.Rev. 741, 766 (1982) ("[C]ourts should permit the use of battered woman syndrome expert testimony, but restrict its use to informing juries of the peculiar mental and emotional state of battered women.")
It appears that only the Ohio Supreme Court has unconditionally stated that the battered wife syndrome is not sufficiently developed, as a matter of commonly accepted scientific knowledge, to warrant expert testimony. See State v. Thomas, 66 Ohio St.2d 518, 423 N.E.2d 137 (1981). The court considered that expert testimony "would tend to stereotype defendant, causing the jury to become prejudiced."[8] 423 N.E.2d at 140. At the same time, however, it did not preclude testimony relating to particular signs and symptoms in the allegedly battered defendant. See State v. Thomas, 13 Ohio App.3d 211, 468 N.E.2d 763 (1983) (although not permitting expert testimony relating to syndrome, held proffered testimony admissible because it pertained to particular signs and symptoms).
As reflected by the above survey, although the reasoning in the cases may differ, as they relate to different factual situations, the vast majority regard the syndrome as admissible under appropriate circumstances and conditions. For example, some, as in Pruitt v. State, 164 Ga. App. 247, 296 S.E.2d 795 (1982), upheld the denial of admissibility of expert testimony on the ground that the testimony was irrelevant, since there was no woman defendant asserting the defense of self-defense, nor any evidence that the victim was a battered woman. Accord, Fielder v. State.
Based upon my review of the above cases, I would reverse as an abuse of discretion the trial court's determination "that the depth of study in this field has not yet reached the point where an expert witness can give testimony with any degree of assurance that the state of the art will support an expert opinion ...", on the ground that such determination is not consistent with the decisions in the vast majority of those cases that have addressed the question.

II. THE FRYE OR GENERAL ACCEPTANCE STANDARD SHOULD BE REJECTED AS A PRECONDITION TO THE ADMISSIBILITY OF EVIDENCE RELATING TO NOVEL SCIENTIFIC TECHNIQUES OR THEORIES, BUT IT SHOULD BE INCLUDED AS ONE OF THE FACTORS TO BE CONSIDERED WHEN BALANCING THE PROBATIVE VALUE OF THE PROFFERED EVIDENCE AGAINST OTHER COUNTER-WEIGHTS.
The judicial system in general has been confronted with a large variety of newly developed scientific techniques and theories within the last few years. Neutron activation analysis, voiceprints, psycholinguistics, remote electromagnetic sensing, atomic absorption, bitemark comparisons, liquid crystal thermography, hypnotically refreshed testimony, blood tissue typing, and psychological profiles, such as the one on review, are but a few examples. See Giannelli, supra at 1198; Brown v. State, 426 So.2d 76, 89 (Fla. 1st DCA 1983); Fay v. Mincey, 454 So.2d 587 (Fla. 2d DCA 1984); Bundy v. State, 455 So.2d 330 (Fla. 1984) (Bundy v. State I); Bundy II. The courts no doubt will continue to struggle with issues similar to that on review regarding whether testimony relating to a new theory or technique should be admitted. The law in Florida on *783 the question is decidedly unclear, and if the Florida Evidence Code does require a standard different from that of Frye, a decision attempting to resolve the confusion will hopefully avoid the problem that was caused by this court's prior directions in Hawthorne II.
In that the question regarding the admissibility of novel scientific evidence is one frequently recurring, I consider the time has now arrived to confront directly the issue of whether the satisfaction of the Frye state of the art criterion remains viable, following the enactment of the Evidence Code, as a precondition to the admissibility of such evidence. The confusion spawned by Hawthorne II's approval of the Dyas three-fold test, which includes the Frye general acceptance criterion, is evidenced by later opinions also adopting that test. See, e.g., Borders v. State, 433 So.2d 1325 (Fla. 3d DCA 1983); Terry v. State, 467 So.2d 761 (Fla. 4th DCA 1985). After Hawthorne II had been decided, this court in Brown v. State expressed its reservations regarding whether Frye was the appropriate standard to apply in assessing the admissibility of novel scientific evidence, saying: "It is uncertain from our review of Florida cases whether Frye has been accepted in Florida." 426 So.2d at 86. Indeed, in commenting upon our doubts as to Frye's continuing validity, the Florida Supreme Court in Bundy v. State I observed: "[T]he district court of appeal pointed out that Frye has never authoritatively been adopted by the courts of Florida as the test for the admissibility of scientific evidence generally." 455 So.2d at 341.
Our uncertainty as to whether Frye must be followed is compounded by the adoption of the Florida Evidence Code, applicable to all criminal proceedings relating to crimes committed after July 1, 1979, and to all civil actions pending on or brought after October 1, 1981. § 90.103(2), Fla. Stat. The code, patterned generally after the Federal Rules of Evidence, is, like its federal counterpart, silent as to any requirement that there be general acceptance of a newly developed scientific technique or principle in the particular field in which it belongs. Although there is an issue of controversy over whether the federal rules and the codes of evidence following them were intended to supplant the Frye rule, many commentators advance the viewpoint that Frye is inconsistent with the explicit language contained in the rules; moreover a growing number of cases have voiced similar conclusions. See Giannelli, supra at 1229, n. 249; McCormick, supra at 607, n. 24; 22 C. Wright and K. Graham, Federal Practice and Procedure § 5168, at 49, n. 33 (1978) (1983 pocket part) [hereafter: Wright and Graham].
Adding to the confusion as to whether the Frye standard remains applicable within the state of Florida is the supreme court's recent opinion in Bundy II, holding that hypnotically refreshed testimony is per se inadmissible in criminal trials of this state "because of its basic unreliability." 471 So.2d at 18. In so concluding, the court drew upon certain language in opinions from jurisdictions that apply Frye (State v. Mack, 292 N.W.2d 764 (Minn. 1980); People v. Shirley, 31 Cal.3d 18, 181 Cal. Rptr. 243, 641 P.2d 775 (1982), cert. denied, 459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982); State ex rel. Collins v. Superior Court, 132 Ariz. 180, 644 P.2d 1266 (1982); People v. Gonzales, 415 Mich. 615, 329 N.W.2d 743 (1982)), yet Bundy II never addressed the question of whether Frye's applicability was affected by the adoption of the Evidence Code. At any event, the exclusion of hypnotically refreshed evidence in criminal cases would probably, as McCormick observes, also be required under the relevancy approach, exemplified in the code:
Typically, the courts adopting a strict exclusionary rule rely on the Frye test of general scientific acceptance, although the same result probably could be reached by inquiring directly into the relative costs and benefits of the testimony. Indeed, the more modern cases support their invocation and application of the general acceptance standard by examining scientific testimony or literature on *784 the value of hypnosis for recovering memories and by referring to the usual concerns with scientific evidence  its suspected tendency to over-awe the jury and to consume time and resources  in a matter of particular sensitivity.
McCormick, supra at 633 (footnotes omitted).
In my judgment, I consider the preferred approach is to acknowledge that Frye's general acceptance standard as a means of determining the admissibility of scientific evidence is inconsistent with the procedure outlined in the Evidence Code, thereby requiring  while not an outright rejection of the Frye standard  a different application of it. The clear language of the Florida Evidence Code differs sharply from the Frye approach  or, at any event, the interpretation placed upon Frye by Dyas and the two Ibn-Tamas opinions. In contrast to the Evidence Code, satisfaction of all three of the Dyas criteria, including the general acceptance standard, is a precondition to the admissibility of any newly developed scientific technique. If all criteria are satisfied, balancing next occurs by deciding whether the probative value of the evidence is outweighed by its prejudicial impact. Ibn-Tamas I, 407 A.2d at 632.
The Ibn-Tamas application of the general acceptance standard is inconsistent with those provisions of the code pertaining to the admissibility of expert testimony, particularly Sections 90.401, .402, .403, and .702, Florida Statutes. Section 90.401 defines relevant evidence as "evidence tending to prove or disprove a material fact." McCormick explains that the term "relevant", as so used, concerns the two components of relevancy: material and probative value; the former meaning evidence offered to help prove a matter in issue, and the latter, evidence having a tendency to establish the proposition it is offered to prove. McCormick, supra, § 185, 541-542. Section 90.402 next provides that "[a]ll relevant evidence is admissible, except as provided by law."
When considering sections 90.401 and 90.402 in pari materia with section 90.702 (imposing, as does Federal Rule 702, a two-part test for the admissibility of expert testimony: (1) that the scientific knowledge "assist the trier of fact in understanding the evidence or in determining a fact in issue," and (2) that the witness be qualified), I reiterate that both of section 90.702's two requisites for the admission of the challenged expert syndrome evidence have already been recognized by this court as satisfied. Hawthorne II foreclosed any argument that evidence of the syndrome was not factually or logically relevant:
The expert testimony would have been offered in order to aid the jury in interpreting the surrounding circumstances as they affected the reasonableness of her belief... . [T]he testimony would be offered to show that because she suffered from the syndrome, it was reasonable for her to have remained in the home and, at the pertinent time, to have believed that her life and the lives of her children were in imminent danger.
408 So.2d at 806-807. The majority's opinion in the case at bar, moreover, acknowledges that Dr. Walker possesses the requisite qualifications to express an expert opinion. The evidence before us therefore satisfies the code's initial test of admissibility, in that it has relevancy from the standpoint of having both material and probative value. In contrast to the facts before us, if the expert had failed to possess the necessary qualifications to support an opinion, regardless of the subject matter's otherwise logical relevancy, the evidence for that reason alone should be excluded. If, on the other hand, the expert were deemed qualified, but the subject of the proposed testimony was not material to a fact in issue, the proposed testimony similarly must be excluded. Once, however, the proposed evidence meets section 90.702's two requisites for admissibility, the trial judge's discretion thereafter to exclude is sharply curtailed by the provisions of section 90.403.
Although evidence of the syndrome in the case on review may be considered relevant, because it satisfied section 90.702's *785 dual requisites for admissibility, such relevance, as McCormick notes, "does not ensure [its] admissibility." Id. at 544. One then turns next to Section 90.403, Florida Statutes, to decide, in the words of McCormick, "whether its value is worth what it costs." Id. Unlike the Dyas approach, one then balances the worth of the challenged profile evidence against all other pertinent factors, including the question of its reliability. Section 90.403 provides: "Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence... ." (e.s.) As we observed in Brown v. State, 426 So.2d 88-89:
It is in the area of legal relevancy that certain undertones of Frye become applicable. If Frye should not be per se applied to bar evidence obtained from a new or controversial technique solely because the method is not generally accepted by the scientific community, the technique's reliability is a factor to be considered by the trial judge in determining the question of the evidence's legal relevance. As noted by Professor Giannelli, supra at 1235 (footnotes omitted): "The probative value of scientific evidence, ... ., is connected inextricably to its reliability; if the technique is not reliable, evidence derived from the technique is not relevant."
(e.s.)
Under the Evidence Code, only after balancing has occurred is the trial judge authorized to exercise his or her discretion in deciding whether to exclude evidence  initially determined relevant  on the ground that it is not generally reliable. Although there is nothing in the code explicitly precluding the admissibility of expert opinion testimony if a scientific technique is not generally accepted within the appropriate field, McCormick acknowledges that "there is a question whether opinion evidence is admissible if the court believes that the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert." Id., § 13 at 34 (e.s.). McCormick, however, advocates "that the traditional standards of relevancy and the need for expertise  and nothing more  should govern." Id. § 203 at 608 (e.s.). He continues:
General scientific acceptance is a proper condition for taking judicial notice of scientific facts, but it is not a suitable criterion for the admissibility of scientific evidence. Any relevant conclusions supported by a qualified expert witness should be received unless there are distinct reasons for exclusion. These reasons are the familiar ones of prejudicing or misleading the jury or consuming undue amounts of time.
Id. (e.s.).
Under the relevancy approach, advocated by McCormick, a court in a jurisdiction permitting judicial notice of scientific literature as substantive proof of an issue[9] could allow the establishment of the general acceptance standard by references to reliable scientific papers, lectures, books, articles, etc. In a state such as Florida that prohibits judicial notice of such evidence directly, as part of a proponent's proof, the opponent of an expert's opinion would be allowed on cross-examination to impeach the opinion by reference to statements going to the general acceptance standard in scientific writings. See Section 90.706, Fla. Stat. As already noted, the proponent of novel scientific evidence could, at any event, request the court to take judicial notice of cases from other jurisdictions that have indicated general acceptance of such evidence.
In McCormick's view, the relevancy approach would permit
general scientific opinion of both underlying principles and particular applications to be considered in evaluating the worth of the testimony. In so treating *786 the yeas and nays of the members of a scientific discipline as but one indicating of the validity, accuracy, and reliability of the technique the traditional balancing method focuses the court's attention where it belongs  on the actual usefulness of the evidence in light of the full record developed on the power of the scientific test.
Id. at 609 (e.s.).
Turning to the syndrome, or profile evidence, in particular, McCormick states:
When the profile evidence is used defensively (to show good character, to restore credibility, or to prove apprehension in connection with a claim of self-defense), it falls under an exception to the rule against character evidence. Admissibility then should turn on the extent to which the expert testimony would assist the jury viewed in the light of the usual counterweights. [Balancing under Federal Rule 403, or Section 90.403, Florida Statutes.] The qualifications of the expert, the reliability and validity of using the profile, and the need for the evidence thus affect the admissibility and of course the weight of the profile evidence.
Id., § 206 at 636 (e.s.).
The relevancy approach, encompassed within Florida's Evidence Code, thus differs from Frye in not precluding initially the admissibility of evidence which has not yet gained general acceptance in the particular field in which it belongs; yet is similar to Frye in recognizing that "novelty and want of general acceptance are integral parts of the relevancy analysis" which may lessen the probative value of a scientific test or technique. Giannelli, supra at 1234. Giannelli continues:
Under the relevancy approach, novel scientific evidence is treated the same as other kinds of evidence. Thus, if an expert testifies that an innovative technique is valid, a court could find that evidence derived from that technique is probative. Admissibility, however, would not be automatic. As with all relevant evidence, a court would have discretion to exclude the evidence if the probative value were outweighed by considerations of undue prejudice, misleading the jury, and undue consumption of time.
Id. at 1204.
The discretion conferred upon the trial judge by the Evidence Code to exclude evidence is, as stated, not unlimited. He may only exercise his discretion to exclude if the probative value of relevant evidence "is substantially outweighed" by the factors listed in section 90.403 (e.s.). His discretion, following balancing, differs in significant degree from his initial discretion to decide whether an expert is qualified, pursuant to section 90.702, to offer an opinion, and whether the proposed testimony would assist the trier of fact in understanding the evidence or in determining a fact in issue. Under the latter circumstances, the trial judge typically and appropriately exercises his discretion on the basis of the particular facts before him. But, once he finds that the proponent of the evidence has satisfied the above two requisites for admissibility, he possesses no discretion to exclude without first complying with the provisions of section 90.403.
Wright and Graham point out that "the discretion under Rule 403 is far from a license for free-wheeling exclusion; it carefully delineates a balancing test that must be applied before the evidence can be excluded." 22 Wright and Graham, supra at 74 (e.s.). Moreover, the balancing, or weighing process, cannot involve a consideration of the credibility of the witnesses, which is of course a jury function. Id. 264-66. Finally, in carrying out its responsibilities under Rule 403, a trial court cannot focus its attention exclusively on the challenged evidence, but must compare the value of the proffered evidence against the background of all the evidence in the case. Id. at 273.
Thus we see that the abuse of discretion standard under the relevancy approach differs sharply from its application in the two Ibn-Tamas opinions. There the determination of the issue concerning the subject *787 matter's general acceptance by the relevant scientific community on apparently conflicting evidence depended ultimately on what the trial judge said it to be. The same deference to trial court discretion is exemplified by Coppolino v. State, 223 So.2d 68, 70 (Fla. 2d DCA 1968), appeal dismissed, 234 So.2d 120 (Fla. 1969), cert. denied, 399 U.S. 927, 90 S.Ct. 2242, 26 L.Ed.2d 794 (1970), decided before the adoption of the Evidence Code, in which the appellate court affirmed the admission into evidence of a novel test, specifically designed for that case, for the purpose of showing the presence of succinylcholine chloride in the body of the deceased. Although the court cited Frye's general acceptance rule, the court apparently ignored it, relying instead upon the abuse of discretion standard.
In the present case, the most that can be said against the admissibility of evidence regarding the battered woman syndrome is that its value is debatable. A conflict or a debate among experts as to the validity of a particular methodology does not, under section 90.403, call for the exercise of a trial court's discretion to exclude:
The phrasing of Rule 403 makes it clear that the discretion to exclude does not arise when the balance between the probative worth and the countervailing factors is debatable; there must be a significant tipping of the scales against the evidentiary worth of the proffered evidence. Thus, the appellate court need not find that the trial judge abused his discretion; it is enough that he erred in concluding that he had any discretion.
22 Wright and Graham, supra at 309-310 (e.s.).
It is time for the judiciary system to recognize that the Evidence Code establishes a different standard in assessing the admissibility of novel scientific theories or techniques than does Frye. Their admissibility is not dependent solely upon proof that they have not generally been accepted by the relevant field  although lack of general acceptance, when balanced against all counterweights, pursuant to section 90.403, is clearly a component to be considered in determining whether the probative value of such evidence is substantially outweighed by countervailing factors. If the challenged evidence, such as that in the present case, is logically relevant, and if balancing does not reveal it to be substantially outweighed by the factors enumerated in section 90.403, the trial judge should tip his hand in favor of admissibility.
Had the trial court below been appropriately directed to follow the procedure that appears to be required by the Evidence Code, and if it had nevertheless exercised its discretion to exclude, such decision would have constituted an abuse of discretion. The weight and quality of the evidence clearly demonstrate that Dr. Walker's proffered testimony should have been admitted  particularly when it is considered that such evidence was crucial to appellant's claim of self-defense.[10]
Today's opinion points out the need for a definitive statement from the Florida Supreme Court defining the respective roles of the trial and appellate courts, when carrying out their responsibilities under the Florida Evidence Code, in determining the admissibility of new scientific theories or techniques. Pursuant to Florida Rule of Appellate Procedure 9.030(a)(2)(A)(v), I would certify the following question to be one of great public importance:
HAS THE FRYE STANDARD OF GENERAL ACCEPTANCE WITHIN THE PARTICULAR SCIENTIFIC COMMUNITY, AS A PRECONDITION TO THE *788 ADMISSIBILITY OF NOVEL SCIENTIFIC EVIDENCE, SURVIVED THE ADOPTION OF THE FLORIDA EVIDENCE CODE? AND IF IT HAS NOT, DOES IT NEVERTHELESS REMAIN A FACTOR TO BE CONSIDERED WHEN BALANCING THE PROBATIVE WORTH OF THE PROFFERED EVIDENCE AGAINST COUNTERVAILING FACTORS, AS PROVIDED BY SECTION 90.403, FLORIDA STATUTES?
NOTES
[1] The following exchange took place:

Q. (By Mr. Johnson) Mrs. Hawthorne, before you called the Sheriff's Department, you called a lawyer, didn't you?
MR. THOMAS: Do you care to hear argument on that, Judge  the cases?
JUDGE: I don't think it is necessary, sir. Your objection is overruled. Go ahead, sir. Answer the question, ma'am.
THE WITNESS: I called a lawyer at some point. I don't know if it was before or after.
Q. (By Mr. Johnson) You don't remember if it was before or after. Do you remember the names of those lawyers?
MR. THOMAS: Could I have a continuing objection to this line of questioning, Judge?
JUDGE: No, there is no such thing as a continuing objection. I understand what you are saying but 
MR. THOMAS: (Interposing) All right. I am making one right now again, and the same motion.
JUDGE: Your objection is overruled and your motion is denied, sir.
MR. THOMAS: Thank you, Judge.
Q. (By Mr. Johnson) Do you remember the names of those lawyers?
A. Yes, sir.
Q. Who was the first one you called?
A. Mr. Warfield.
Q. Mr. Warfield. What happened when you called Mr. Warfield?
JUDGE: Now 
MR. JOHNSON: (Interposing) There is no conversation, Your Honor.
JUDGE: I know that.
Q. (By Mr. Johnson) What happened when you called Mr. Warfield?
A. There was no answer.
Q. You got a recording, didn't you?
A. Yes, sir.
Q. And then you called Mr. Behr, didn't you?
A. Yes, sir.
Q. And then it was sometime after you talked to Mr. Behr that Mr. Kerrigan called you, wasn't it?
A. Yes, sir.
MR. THOMAS: I object again. It is going far afield.
JUDGE: Your objection is overruled, sir.
MR. THOMAS: The same motion.
JUDGE: Denied, sir.
MR. THOMAS: Thank you.
Q. (By Mr. Johnson) Mr. Kerrigan then called you after you called Mr. Behr, is that right?
A. There was a call, yes.
Q. From Mr. Kerrigan?
A. Yes.
Q. Bob Kerrigan?
A. I don't know his first name.
Q. And, Mrs. Hawthorne, Mr. Kerrigan was at the Sheriff's Department when you were calling in about your husband's death, wasn't he?
MR. THOMAS: The same objection, Your Honor.
JUDGE: If she knows, she may answer the question. The objection is overruled.
THE WITNESS: I wouldn't have any idea.
Q. (By Mr. Johnson) Did Mr. Kerrigan call you from the Sheriff's Department?
A. I don't know.
Q. One last question, Mrs. Hawthorne: Do you remember calling the lawyer before you called the Sheriff's Department?
A. I don't remember in what sequence I called.
Q. You knew you needed help, didn't you?
A. Someone was telling me  I was even told to go call an ambulance. I don't know whether it was my mother or my daughter that told me.
Q. But you called the lawyer first?
A. I don't recall.
MR. JOHNSON: Thank you, Mrs. Hawthorne.
[2] Although the state in its brief argues it obtained the information through independent tangible evidence, this "evidence" on its face does not convince us that the state could have reached the conclusion it did without benefit of the taped statement. Indeed, the questions propounded by the state on cross-examination track appellant's coerced statement.
[3] Use By Trial Courts Of Standard Jury Instructions In Criminal Cases, 431 So.2d 594 (Fla. 1981).
[1] The battered woman syndrome is defined by Dr. Walker as "a woman who is repeatedly subjected to any forceful physical and psychological behavior by a man in order to coerce her to do something he wants her to do without any concern for her rights." L. Walker, The Battered Woman, XV (Harper and Row, 1979). McCormick describes the syndrome as a type of profile  a psychological study showing a correlation between certain traits or characteristics and certain forms of behavior, from which diagnostic or predictive profiles can be constructed for such behavior. E. Cleary, McCormick on Evidence, § 206 at 634-35 (3d ed. 1984).
[2] This requirement is imposed in Florida by Section 90.702, Florida Statutes.
[3] The Florida Evidence Code does not state this criterion as a factor to be considered in determining the admissibility of expert testimony, although Florida case law has suggested it may be a factor. See discussion infra at 783.
[4] Although this condition is not explicitly imposed by Florida's Evidence Code, Florida case law had required such a showing before the adoption of the code. See Mills v. Redwing Carriers, Inc., 127 So.2d 453, 456 (Fla. 2d DCA 1961); Buchman v. Seaboard Coast Line Railroad Co., 381 So.2d 229, 230 (Fla. 1980).
[5] Indeed Ibn-Tamas I stated, after considering Dr. Walker's qualifications, that she could not be disqualified "as a matter of law." 407 A.2d at 637. See also Ibn-Tamas I's extensive recitation of Dr. Walker's qualifications as an expert. 407 A.2d at 637 n. 18.
[6] Dr. Gelles testified at the hearing below that the article was directed primarily to a study of child abuse  not spouse abuse.
[7] Professor Ehrhardt comments that such literature must be considered hearsay if offered as substantive evidence in that "[n]o hearsay exception is recognized in Florida for the contents of a treatise." C. Ehrhardt, Florida Evidence § 706.1 at 425 (2d ed. 1984).
[8] McCormick, in commenting on the Thomas opinion, states, "The claim that there is something inherently prejudicial in this type of reasoning cannot withstand analysis." McCormick, supra at 636, n. 4.
[9] For example, Federal Rule of Evidence 803(18) recognizes as an exception to the hearsay rule statements in learned treatises.
[10] A trial court's denial of a defendant's use of probative evidence in a criminal trial may rise to the level of constitutional dimension. Although a defendant has no constitutional right to introduce irrelevant evidence, if the evidence has probative worth, it should be measured by a different standard than the usual test of abuse of discretion. See State v. Dorsey, 87 N.M. 323, 532 P.2d 912 (Ct.App.); aff'd, 88 N.M. 184, 539 P.2d 204 (1975). See also Westen, The Compulsory Process Clause, 73 Mich.L.Rev. 73, 149-59 (1974). Cf. United States v. Dwyer, 539 F.2d 924, 928 (2nd Cir.1976) (trial court erred in excluding the testimony of the only defense witness who could establish the insanity of defendant).